DECISION
This appeal, filed by plaintiff John Parenti, concerns a decision by a hearing officer of the Rhode Island Department of Business Regulation, approved by its Director, that found that Parenti violated Rule 20 of Commercial Licensing Regulation 11 — Real Estate Brokers and Salespersons and R.I. Gen. Laws 1956 §§5-20.5-14(a)(15) and 5-20.5-14(a)(20) in connection with his dealings as a broker for the sellers of residential real estate. For the reasons set forth in this Decision, this Court affirms the decision below.
 FACTS AND TRAVEL
In May 2001, Thomas F. Hynes and Cathleen Hynes (the "Hyneses") retained John Parenti ("Parenti"), a licensed real estate broker and principal of Blue Sky Realty, Inc., to sell their Scituate, Rhode Island, home. After the property had been on the market for several months, a broker representing potential buyers presented a full price offer in the form of a signed purchase and sale agreement. This buyer eventually withdrew this offer, the sellers terminated Parenti's representation, and the sellers sold the property at significantly below the asking price.
On March 22, 2002, Thomas F. Hynes ("Hynes") filed a complaint against Parenti with the Department of Business Regulation relating to Parenti's handling of the withdrawn offer. The Department is vested with the authority to regulate the licensing of realtors and real estate salespersons. A hearing officer appointed by the Department held hearings on October 17, October 18, and November 18, 2002, at which the Hyneses and Parenti were each represented by counsel. The hearing officer heard testimony and received additional evidence by affidavit and deposition. Both parties submitted written closing arguments.
Finding Parenti's conduct to be in violation of applicable rules and statutes, the hearing officer issued a decision and recommendation dated March 10, 2003. She recommended to the Director of the Department, Marilyn Shannon McConaghy, that administrative penalties be imposed on Parenti. The Director approved the recommendation on the same date.
On March 20, 2003, Parenti filed a timely motion for reconsideration, asking the hearing officer to reconsider her decision. On April 3, 2003, the hearing officer issued a decision denying the motion for reconsideration which the Director adopted on the same date.
On May 2, 2003, Parenti, as plaintiff, filed a timely appeal from the decision of the Director, dated March 10, 2003, as affirmed by the decision denying his motion for reconsideration dated April 3, 2003.[1] He named Marilyn Shannon McConaghy as a defendant in her official capacity as Director of the Department. He also moved to stay the decision below until this appeal could be decided on its merits. A hearing justice of this Court granted Parenti's motion to stay on May 20, 2003, over the Director's objection, thereby staying the penalties imposed against Parenti in the hearing officer's decision, as approved by the Director, until this appeal could be decided.
The parties filed a stipulated briefing schedule. Plaintiff Parenti filed a memorandum of law to which he attached copies of three volumes of unofficial transcripts of the hearings before the Department,[2] a copy of an unofficial transcript of a deposition of Marie McEleny and an unofficial copy of the decision of the hearing officer as approved by the Director. He did not attach copies of the exhibits admitted into evidence at the hearings and referenced in the hearing officer's decision nor did he include any other portions of the record below. The Director filed a responsive memorandum of law, to which plaintiff Parenti replied. No additional record evidence is attached to these filings.
Although the parties represented to a hearing justice of this Court that the matter was ripe for decision, it was not. They never took the requisite steps to ensure that the administrative record had been filed in this Court. In particular, the Department never filed an official or certified record of the entire proceedings under review, as it is required to do within thirty (30) days of the filing of plaintiff's complaint under R.I. Gen. Laws 1956 § 42-35-15(d), upon payment by the appealing party. See A.J.C. Enterprises, Inc. v. Pastore, 473 A.2d 269
(R.I. 1964). Yet, both parties have proceeded with this appeal as if the attachments to plaintiff's memorandum of law constitute the record for review by this Court. As such, this Court will not further await the filing of the certified record but will treat these attachments, although they constitute an unofficial and incomplete record of the proceedings before the hearing officer and the Director, as the stipulated record for purposes of appellate review under R.I. Gen. Laws § 42-35-15(f).
On appeal, Parenti seeks reversal, remand, or modification of the decision of the Director. He argues that the hearing officer misstated facts; that her findings were unsupported by the evidence; that the hearing officer improperly rejected the uncontradicted testimony of Parenti and his associate, Gail Gallagher; that the decision was affected by error of law; and that the imposition of penalties violated his due process rights. The Director counters that the hearing officer's findings are supported by substantial evidence in the record and are legally appropriate such that the Director's decision, approving the decision of the hearing officer, must be affirmed.
 Evidence Presented to the Hearing Officer
The parties presented to the hearing officer conflicting accounts of the dealings between the Hyneses and Parenti. A brief summary of those facts not in dispute as well as the thrust of the contradictory testimony follows. Other relevant testimony is referenced in this Court's analysis of the decision below.
Mr. and Mrs. Hynes contacted Parenti on May 19, 2001 to inquire about retaining him to sell their home. (Transcript of Dept. of Bus. Regulation Hr'g In re Hynes v. Parenti, DBR No. 02-L-0099, vol. II at 4) [hereinafter Tr.]. Parenti presented a marketing proposal to them, describing how he would market their property, and offered them two options as to how to structure his commission. (Id. at 6-7). The first option provided for a traditional "co-brokerage" commission, whereby the sellers would pay a 6% commission on the purchase price of the house, to be split between the seller's broker and the buyer's broker. (Id.
at 9.) The second option provided for a 3½ commission for the seller's broker — here, Parenti — and one dollar for the buyer's broker, if any. (Id.) The meeting lasted about three hours. (Tr. vol. III at 34.) Parenti did not give the Hyneses a copy of the marketing proposal to keep for their review. (Id.) In fact, Parenti testified that while the Hyneses looked at the proposal, they did not really read it. (Tr. vol. II at 35.)
The Hyneses formally contracted with Parenti on May 25, 2001 to list their house with him under the second commission structure, which provided for a 3½% commission for Parenti, and one dollar for a co-broker, if any. (Id. at 34-35.) Parenti listed the property for sale at a price of $429,000. (Id. at 37.) The Hyneses' property remained on the market from May 25, 2002 to July 10, 2002, during which time Parenti showed the house to more than eight parties, none of whom made an offer to buy it. (Id.
at 51.)
On July 10, 2002, Parenti showed the Hyneses' home to a couple represented by their broker, Marie McEleny. (Tr. vol. I at 17-18; Tr. vol. II at 62-63.) The couple apparently liked the property because their broker arranged to meet with Parenti and the Hyneses on Thursday, July 12, 2001 for the purpose of presenting a written offer. (Tr. vol. I at 18; Tr. vol. II at 68.) Just prior to this meeting, Parenti advised the Hyneses not to speak, to keep poker faces, and to let him do the talking when presented with the offer. (Tr. vol. I at 22; Tr. vol. II at 82-83.) At the meeting, McEleny presented a purchase and sale agreement signed by her clients, with $429,000 (the asking price) as the purchase price, together with a mortgage preapproval letter from Citizens Bank and a photocopy of a bank check payable to Blue Sky Realty, Inc., the listing agency, for $21,400. (Tr. vol. II at 72-74.) These buyers conditioned their offer on "walking the land" because a severe thunderstorm had prevented them from viewing the thirty acre property on their first visit. (Id. at 85.) In addition, although McEleny knew that Parenti was only offering a one dollar commission to any buyer's broker, McEleny told Parenti and his clients that she expected to be paid either half of Parenti's commission or 2½% of the purchase price. (Tr. vol. II at 80; McEleny Dep. at 14.) McEleny appended this condition to the purchase and sale agreement as a document entitled Addendum A.
Addendum A stated that the buyer's agent "shall be paid a fee in the amount of $ ______ (2½% of the purchase price) as follows or 50% of the commission paid to the Listing Agency." Hynes v.Parenti, DBR No. 02-L-0099 at 24 (March 10, 2003) (hereinafter Dec'n of Hr'g Off.). Below that statement were three choices to indicate who would pay the buyer's agent's fee: the listing broker, the seller, or the buyer. The second and third choices were crossed out; a sentence followed that read: "[t]he Listing Broker has agreed to pay [McEleny] a fee, for procuring the Buyer from the listing commission, in the amount of $ _____ (2½% of the purchase price) or 50% of the commission paid to the listing agency." (Id.)
In response to McEleny's request, Parenti brusquely told her "I do not split my portion of the commission." (Tr. vol. II at 81.) McEleny did not state for how long the offer would remain open. The Hyneses, Parenti testified, were ecstatic about the offer. (Id. at 94.)
Thomas Hynes testified that, following the meeting with McEleny, he suggested to Parenti that they might be willing to offer a $5,000 finder's fee to McEleny for procuring a buyer. (Tr. vol. I at 26, 130.) He said that Parenti told the Hyneses that there would be other offers and that the buyers probably had an agreement with their broker to compensate her.[3]
(Id.) Hynes also stated that although McEleny had left copies of the purchase and sale agreement for them, Parenti did not review it with the Hyneses or leave a copy for them. (Id. at 27, 161, 235.)
Parenti testified, however, that he did review the offer with the Hyneses, line by line. (Tr. vol. II at 93.) He indicated that there were some problems with the offer. First, the proposed closing date was August 16, 2001; he had understood that the Hyneses would have preferred it to be at the end of August. (Id. at 94.) In addition, Parenti testified that the mortgage preapproval letter that McEleny had presented was "not a preapproval" because "a bank won't do it, especially Citizens Bank, who is a conservative lender before they've even seen a purchase and sales agreement on a house." (Id. at 95.) In addition, he pointed out that the prospective buyers conditioned their offer upon walking the property. (Id. at 97.)
Parenti also testified that Blue Sky Realty objected to Addendum A. (Id. at 98.) Parenti stated that he objected to the fact that one of the choices was that he would split his fee. (Tr. vol. III at 49-51.) He said that had the Hyneses signed it, "I would have refused to have paid [McEleny]." (Id. at 50.) He testified that his understanding of the term was that it required him to pay either half of his commission or 2½% of the purchase price, to be deducted from his commission. (Id. at 114.)
He stated at the hearing that he told the Hyneses that they could negotiate the objectionable terms and that such suggestions would be counteroffers. (Tr. vol. II at 237-38.) When asked whether the Hyneses knew that a counteroffer would effect a formal rejection of the offer, he said "they knew it. . . . I covered it in my listing presentation." (Id. at 238.) When asked again whether he advised the Hyneses that once they offered different terms, the offer embodied in the purchase and sale agreement would be rejected, he said it "[n]ever came up." (Id.
at 240.) At the end of their meeting, Parenti testified, he asked the Hyneses whether they wanted to retain a copy of the purchase and sale agreement and they declined. (Id. at 105.)
In the meantime, Parenti had scheduled another showing of the house for 9:30 a.m. on Saturday, July 14, 2001 with another couple. (Id. at 117.) This showing was the next time the Hyneses saw Parenti. (Id. at 31.) Thomas Hynes testified that on that morning, he told Parenti that he would like to offer McEleny the full 2½% commission that she had requested. (Id.) In response, Hynes testified, Parenti said that her clients probably had a buyer's agreement with McEleny. (Id.) Although Hynes asked him to present that offer to McEleny, Parenti did not agree to do so, saying that he wanted to show the house that morning. (Id.) Hynes stated that he told Parenti that he wanted to close the deal by 4:00 p.m. that day, and that if it required paying McEleny the commission, they would do that. (Id. at 32.) The testimony of Gail Gallagher, Parenti's associate, corroborated Hynes' testimony in this regard. (Tr. vol. III at 132.)
Parenti testified that he and Gallagher arrived at the Hyneses' property on Saturday, July 14, 2001 to show the property to the second couple. (Id. at 120.) He stated that Hynes wanted to set a deadline of 2:00 p.m. for making a decision on whether to accept the prior offer, but that Hynes also had expressed a desire to have a multiple offer situation. (Id. at 122-23.) Parenti showed the property to the second couple between 9:30 a.m. and 11:30 a.m. and told them about Hynes' self-imposed deadline of 2:00 p.m.; Parenti testified that the Hyneses told him that they would inform him of whether they would make an offer by that time. (Id. at 126.) Parenti stated that he then called Thomas Hynes to tell him of the possible second offer. (Id.) At that point, the first buyers arrived for their second showing. (Id. at 132.) After viewing the grounds and house, they agreed to remove the contingency on their prior offer, Parenti said. (Id. at 133.) The second prospective buyers called Parenti at 2:00 p.m. that afternoon to verbally offer $435,000 for the Hyneses' property; the three agreed to meet at 3:00 p.m. to put the offer in writing. (Id. at 136.) Parenti testified that when informed of this development, Hynes said that he would extend his deadline until 4:00 p.m.
Parenti testified that at approximately 3:00 p.m., he met the second couple at his office to put their offer in writing. Parenti decided to draft a purchase and sale agreement right away, rather than a written offer form. (Id. at 137.) As they were reviewing the document at approximately 4:00 p.m., however, Parenti testified that the wife became concerned because she believed that she was making a hasty decision. (Id. at 140.) He continued to press this couple to sign the contract until 7:15 p.m. (Id. at 141, 149.) In the meantime, Parenti stated, Hynes had called at 4:00 p.m., 5:00 p.m., 6:00 p.m. and 7:00 p.m. (Id.) Parenti did not take any of these calls. (Id. at 150.) When the second couple departed, Parenti said that he called Hynes to inform him that no offer had been made; in fact, he testified that he believed that within an hour into their meeting, they were not going to sign the purchase and sale agreement. (Id. at 152.) Parenti testified that Hynes responded by suggesting that they offer McEleny a $5,000 finder's fee. (Id.) Parenti said that he had Gallagher contact McEleny to relay that information; Parenti testified that he heard Gallagher tell Hynes that McEleny's response was, "five thousand dollars, is that all?" but that she would pass the information on to the first buyers. (Id. at 153.) Gallagher's testimony was consistent with this version of events. (Id. at 136.)
Thomas Hynes called Parenti again the next morning, on Sunday July 15, 2001; Parenti told his clients to go to the beach and not to worry about the first buyers because they loved the house. (Tr. vol. II at 161.) Parenti and Gallagher testified that on that afternoon, Hynes became nervous and called to authorize Parenti to offer McEleny a 2½% commission. (Tr. vol. II at 164; Tr. vol. III at 139.) Parenti said that he spoke to Thomas Hynes that evening indicating that he would like to draw up a new contract because the one presented by McEleny had too many changes and initials on it. (Id.) On Monday, July 16, 2001, Parenti stated that he finally called McEleny, who told him that her clients were no longer interested in buying the property. When Parenti told her of the Hyneses' offer of the 2½% commission, she told Parenti that she would try to change their minds. (Tr. vol. II at 166.) Thomas Hynes testified that when Parenti informed him that the offer had been withdrawn, the explanation he offered was that McEleny's clients were "fickle buyers." (Tr. vol. I at 43.) Parenti stated that when he spoke to McEleny on Tuesday, July 17, 2001, she stated that her clients were not interested in the property because the commute was too long and they "felt they had been jerked around." (Tr. vol. II at 170; McEleny Dep. at 27-30.) McEleny testified that she actually thought that her clients' complaint that the commute would be too long was just an excuse. (McEleny Dep. at 30.)
Shortly thereafter, the Hyneses informed Parenti that they had lost confidence in him, that he did not have their best interests in mind, and that they no longer wanted him to continue to represent them. (Id. at 44-45.) The Hyneses paid Parenti $200 to be released from their contract with him. (Id. at 44.)
 The Decision of the Hearing Officer
In rendering a decision and recommendation in this matter, the hearing officer reviewed and summarized the record evidence and made thorough factual findings. She found that McEleny had intended to ask for a commission on the sale of either half of Parenti's commission or 2½% of the purchase price, to be paid by the sellers. (Dec'n of Hr'g Off. at 25.) She concluded that Parenti did not discuss with the Hyneses the fact that Addendum A appeared to erroneously require the seller's agent, not the seller, to pay the 2½% commission, but instead was "more focused on the fact that McEleny wanted to make more than one (1) dollar." (Id. at 26.) The hearing officer noted that had Parenti reviewed the terms with the Hyneses, they could have discussed options like amending Addendum A to reflect the parties' intent. (Id.) Based on these and other findings, the hearing officer concluded that Parenti failed to communicate information to his clients that would have or could have been material to their decision of whether to accept the offer. (Id.
at 26.)
The hearing officer further found Thomas Hynes' testimony that he was ready to accept the first buyers' offer on the morning of Saturday, July 14, 2001 more credible than Parenti's testimony to the contrary. However, Parenti did not return the purchase and sale agreement to the Hyneses for them to review when he returned that day at 12:00 p.m. to show the house to the first buyers. (Id.) The hearing officer found Parenti's explanation for why he did not give the Hyneses the purchase and sale agreement "disingenuous" and noted that Parenti could have left it for them at their home. (Id.) Instead, he continued to court the second prospective buyers, who were not represented by a broker. (Id.) Thinking that they might make a higher offer than the first buyers, he let Thomas Hynes' 4:00 p.m. deadline pass while he "tried his sales technique" for the next three hours on a couple who had just seen the house that morning, had no deposit check, and had shown no evidence of their financial ability to complete the sale. (Id. at 29.) The hearing officer did not accept Parenti's testimony that this action was in the best interests of the Hyneses. (Id.) In fact, the hearing officer suggested that Parenti was simply hoping for a higher commission from a sale to the second prospective buyers because of the higher sales price and the fact that no other broker was involved. (Id.)
The hearing officer outlined what she perceived as failures by Parenti to comply with his obligation to communicate with his clients: Parenti did not answer his clients' calls on the afternoon of Saturday, July 14, 2001, even after their deadline for accepting the first buyers' offer had passed; he did not convey information to the Hyneses to evaluate that offer, instead expecting them to remember details from his sales presentation two months before; he failed to communicate to McEleny his clients' willingness to pay her fee; and he did not give the Hyneses a chance to sign the purchase and sales agreement. (Id.
at 30-31.) The hearing officer found these failures to be unlawful.
R.I. Gen Laws § 5-20.5-14(a) allows the Director of the Department of Business Regulation to suspend or revoke a real estate license or place a licensee on probation where the licensee is found guilty of, inter alia, "[v]iolating any rule or regulation promulgated by the commission or the department in the interest of the public and consistent with the provisions of this chapter," and "[a]ny conduct in a real estate transaction, which demonstrates bad faith, dishonesty, untrustworthiness, or incompetency." See R.I. Gen. Laws §§ 5-20.5-14(a)(15) and5-20.5-14(a)(20). Rule 20 of Commercial Licensing Regulation 11 (hereinafter Rule 20) provides:
 All Licensees are subject to and shall strictly comply with the laws of agency and the principals governing fiduciary relationships. Thus, in accepting employment as an agent, the Licensee pledges him/herself to protect and promote, as he/she would his own, the interests of the principal he/she has undertaken to represent. This obligation of absolute fidelity to the principal's interest is primary, but does not relieve the Licensee from the binding obligation of dealing fairly with all parties to the transaction.
Based on her factual findings, the hearing officer concluded that Parenti had violated Rule 20 and, thus, R.I. Gen. Laws §5-20.5-14(a)(15), as well as R.I. Gen. Laws § 5-20.5-14(a)(20). (Dec'n of Hr'g Off. at 33-34.) The hearing officer concluded that Parenti had violated Rule 20 because he "would not treat himself as he treated Complainant." (Id. at 32.) Parenti's failure to communicate material information to the Hyneses that was necessary to a full evaluation of the first buyers' offer and his failure to inform McEleny that the Hyneses were willing to pay a finder's fee or a 2½% commission constituted a breach of Parenti's fiduciary duties. (Id. at 33.)
The hearing officer also found that Parenti's lack of communication with the Hyneses demonstrated "bad faith, dishonesty, untrustworthiness, or incompetency in the real estate transaction at issue," as did his failure to convey their offer to pay McEleny a fee. (Id.) In support of this conclusion, she cited several decisions of the Department of Business Regulation pertinent to a realtor's duty to communicate with his or her client. (Id.) She noted that communication is a "basic obligation," and that because the "realtor is the professional in the relationship . . . it is incumbent on him or her to ensure that those lines of communication are kept open and that he or she keeps himself or herself fully informed of the details of the transaction." (Id.) (citing Gallo v. Smith, DBR No. 02-L-0058 at 12 (May 7, 2001); Roberts v. Gosetti, DBR No. 01-L-0150 at 8 (Dec. 7, 2001)).
Due to the seriousness of the violations, the hearing officer determined that a penalty should be imposed pursuant to R.I. Gen. Laws § 5-20.5-14(b). She recommended that Parenti pay an administrative penalty of $2,000 and that his license be suspended for ten days; she further recommended that notice of his license suspension be published once in The ProvidenceJournal, with Parenti bearing the cost. (Id. at 36.) The Director adopted the recommendations of the hearing officer on March 10, 2003. Parenti subsequently moved for reconsideration. The hearing officer denied that motion in a written decision approved by the Director on April 3, 2003, rendering the Director's decision final and appealable.
 STANDARD OF REVIEW
In reviewing the Director's decision pursuant to R.I. Gen. Laws § 5-10.5-16, this Court is bound by the standards of review set forth in R.I. Gen. Laws § 42-35-15(g), which provides:
 The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
"In reviewing the decision of an administrative agency, the Superior Court is limited to `an examination of the certified record to determine if there is any legally competent evidence therein to support the agency's decision.'" Johnston AmbulatorySurgical Assocs. v. Nolan, 755 A.2d 799, 804-805 (R.I. 2000) (quoting Barrington Sch. Comm. v. Rhode Island State LaborRelations Bd., 608 A.2d 1126, 1138 (R.I. 1992)). The Court may not substitute its judgment for that of the agency on questions of fact. Johnston Ambulatory Surgical Assoc.,755 A.2d at 804-05 (quoting Rhode Island Public Telecomm. Auth. v. RhodeIsland State Labor Relations Board, 650 A.2d 479, 485 (RI. 1994)). This rule holds "even in a case in which the court `might be inclined to view the evidence differently and draw inferences different from those of the agency.'" (Id.) The Court may not consider "whether the evidence was strong or weak, direct or circumstantial, nor [may it] pass on the credibility of witnesses." Edge-January, Inc. v. Pastore, 430 A.2d 1063, 1065
(R.I. 1981).
 ANALYSIS The Question of Whether Substantial Evidence Supports the Decision Below
Plaintiff Parenti advances numerous arguments in favor of reversing the Director's decision, most of which challenge the sufficiency of the evidence supporting the hearing officer's factual findings that were adopted by the Director. First, he asserts that the hearing officer's finding that he failed to communicate to McEleny either the offer of a $5,000 finder's fee or the 2½% commission is not supported by substantial evidence or is based on erroneous conclusions of law. In particular, Parenti asserts that testimony to the contrary — his and Gallagher's — was given no weight.
In finding that Parenti never communicated the Hyneses' offer to pay McEleny, the hearing officer credited Thomas Hynes' testimony that he had made such offers and relied upon McEleny's deposition testimony to the effect that Parenti never spoke to her about her commission or about any payment. (Hr'g Off. Dec'n at 18.) McEleny stated that her only knowledge of such an offer came from Hynes after her clients' offer had been withdrawn. (Id.) Parenti asserts that his testimony was rejected "out of hand" and that the hearing officer should not have credited McEleny's testimony because she admitted to having some memory loss related to an automobile accident. Further, he asserts that there was no basis for the hearing officer's rejection of Parenti's and Gallagher's testimony that they conveyed the offer of a $5,000 finder's fee to McEleny at 7:15 p.m. on Saturday, July 14, 2001 and that they conveyed the offer of a 2½% commission to McEleny at 8:30 a.m. on Monday, July 16, 2001.
In crediting McEleny's testimony rather than that of Parenti and Gallagher, the hearing officer acknowledged McEleny's admitted memory loss, but believed that McEleny was quite clear in her recollection that Parenti never had presented her with a counteroffer from the Hyneses or indicated that they were willing to pay her a 2½% commission. (Id. at 20.) A review of McEleny's deposition corroborates the hearing officer's view of the broker's testimony. Further, the hearing officer found that Parenti's testimony was simply not credible based on glaring inconsistencies in his testimony during the three days of the hearing. (Id. at 22-23.) With regard to Gallagher, the hearing officer found that her credibility was called into question by the fact that she had been in a personal relationship with Parenti since 1985 and might have been biased. (Id. at 16.) The hearing officer's finding that Parenti never notified McEleny of the Hyneses' offer to pay McEleny's brokerage fee is thus supported by the competent evidence, is not clearly erroneous and accordingly must be upheld.
Parenti next asserts that the hearing officer's finding that he failed to properly discuss the ramifications of a counteroffer with the Hyneses is not supported by substantial evidence or is based on erroneous conclusions of law. Parenti contends that he discussed the issue of counteroffers in his May 2001 listing presentation with the Hyneses and the fact that he did so before the Hyneses hired him is of no relevance to whether he gave them this necessary information. In addition, he asserts that Gallagher also explained the effect of a counteroffer to the Hyneses and that the hearing officer gave that fact no weight only because Gallagher was not the Hyneses' broker.
The hearing officer gave quite a detailed explanation of her finding that Parenti did not adequately inform the Hyneses of the effects of a counteroffer. She noted that Parenti testified on October 18, 2001 that he did not discuss this information with his clients at the time of these disputed events. (Id. at 20.) Although crediting Parenti's testimony that this information was part of his marketing proposal, the hearing officer noted that, at that time, the Hyneses still were deciding who to hire as a broker, Parenti's presentation lasted several hours, and the Hyneses were not permitted to retain Parenti's literature to peruse on their own. (Id.)
Moreover, when the hearing officer reconvened the hearing a month later on November 18, 2001, Parenti had a new explanation for why he did not discuss the effects of a counteroffer with the Hyneses. (Id. at 21.) He testified that when he was out of the room on Thursday, July 12, 2001, Gallagher explained to the Hyneses that a counteroffer would act as a rejection. He explained that he did not mention Gallagher's role at the previous hearing because he was not specifically asked whether she had explained a counteroffer to the Hyneses and the questions were coming too fast. (Id.) The hearing officer did not credit this new testimony, finding that Parenti's "explanation falls flat." (Id.) She noted that throughout Parenti's extensive testimony — well over six hours total — his answers were inappropriately detailed, often going beyond the scope of the questions asked, that he repeatedly asked the hearing officer if he could explain his answers, and that he used written notes to testify to an hour-by-hour chronology of the initial events of Saturday July 14, 2001.[4] (Id. at 22-23.) In addition, the Hyneses, as Florida residents who were unable to attend the November 18, 2003 hearing, submitted written testimony that Parenti did not leave the room at any time during the Thursday, July 12, 2001 meeting and that neither Gallagher nor anyone else explained the meaning of a counteroffer to them. (Id. at 16-17.)
The hearing officer's rejection of Parenti's and Gallagher's testimony at the November hearing that Gallagher had explained the ramifications of making a counteroffer is supported by competent evidence in the record, is not clearly erroneous and must be upheld. Because the hearing officer found that Gallagher did not explain the meaning of a counteroffer to the Hyneses, this Court need not reach the legal question of whether the communication of such information is a non-delegable duty.
Next, Parenti argues that the hearing officer's finding that he failed to discuss the ramifications of McEleny's discussion of Addendum A with the Hyneses is not supported by substantial evidence. Parenti asserts that it would be illogical to conclude that he did not discuss the effects of "either/or" in Addendum A because a failure on his part to do so could have resulted in his having to pay either 2½% of the sales price or half of his commission. Without citing any particular record evidence, Parenti argues that there is substantial evidence in the record to show that he did discuss the ramifications of the "either/or" provision with the Hynes.
The hearing officer found that the substance of the either/or provision of Addendum A was discussed at the July 12, 2001 meeting at which McEleny presented her clients' offer to the Hyneses and Parenti. Based on McEleny's testimony, the hearing officer interpreted the intended meaning of the ambiguous term to require either the sellers to pay a 2½% commission or Parenti to split his commission. (Id. at 25.) The hearing officer also found that Parenti "never discussed with the Hyneses why McEleny would expect to be paid as most real estate salespersons or brokers expect to be paid via a split of a 6% commission. Instead, he claimed that McEleny must be a buyer's agent." (Id.) He did not discuss the options available to the Hyneses, "like signing the purchase and sales agreement as is or amending Addendum A to clarify the seller would pay and making a counteroffer that would most likely have been accepted." (Id.
at 26.)
After a review of the record, there is substantial evidence to support the hearing officer's finding that Parenti did not discuss with the Hyneses their options with regard to proceeding with the sale in light of the commission structure set up between he and his clients. Thomas Hynes testified that Parenti never discussed any of the documents presented by McEleny with them. (Tr. vol I at 161.) Similarly, although Parenti characterized the Hyneses as "ecstatic" about the offer, he did not testify to having done anything to facilitate their going forward with the deal. (Tr. vol. II at 84-98.) Indeed, although he claims that he reviewed Addendum A with them, he merely told the Hyneses that the form had been filled out improperly and was not acceptable to Blue Sky Realty. (Id. at 97.) While Parenti attempted to more fully explain his reasons for objecting to Addendum A to the hearing officer, he did not testify at the hearing that he explained its provisions to the Hyneses. (Id. at 97, 101-03.) In addition, he testified that he discouraged the Hyneses from making any changes to the purchase and sale agreement presented by McEleny, saying that some lenders would "kick the agreement back, because it's too messing [sic], too doctored up." (Id. at 104.) Parenti's argument in this regard is thus without merit.
Next, plaintiff Parenti disputes the hearing officer's finding that he failed to give the Hyneses a chance to sign the purchase and sale agreement. Parenti notes that he testified that he asked the Hyneses if they would like to retain the documents presented by McEleny at the July 12, 2001 meeting, but that they declined to do so. Parenti also notes that he testified that the Hyneses could have had the documents at any time if they had asked. He asserts that these statements were never denied by the Hyneses. He claims that the evidence shows that he was looking out for his clients' best interests by preventing them from signing the purchase and sale agreement too hastily because there were problems with the offer.
The hearing officer acknowledged, but rejected, this testimony, finding that the Hyneses were never in a position to sign the agreement. (Hr'g Off. Dec'n at 22.) She noted in her decision that although Parenti testified that the Hyneses could have asked for the agreement at any time, his statement was disingenuous given that during the time that the Hyneses wanted to accept the offer, on Saturday, July 14, 2001, Parenti ignored their attempts to contact him while he tried to sell the property to unwilling buyers. (Id.)
The hearing officer's finding that Parenti's actions prevented the Hyneses from signing the purchase and sale agreement is supported by competent evidence in the record. While there is no evidence that Parenti expressly refused an explicit request from the Hyneses to hand over the purchase and sale agreement, Thomas Hynes testified unequivocally that he told Parenti on the morning of Saturday, July 14, 2001 that he wanted to accept the first offer and complete the deal. (Tr. vol. I at 175, 176, 178, 180.) In addition, it was undisputed at the hearing that, notwithstanding this knowledge, Parenti spent several hours, going past the 4:00 p.m. deadline imposed by his client by three hours, trying to convince a couple who had seen the property only once that day, who he did not think would sign an agreement, and who had no deposit check or preapproval letter, to sign a purchase and sale agreement for the property. The hearing officer rejected Parenti's self-serving testimony, and this Court cannot revisit a determination of credibility that is supported by the record. Edge-January, Inc, 430 A.2d at 1065. As the hearing officer's finding that these actions worked to prevent the Hyneses from accepting the offer from McEleny's clients is not clearly erroneous, it must be upheld.
In a similar vein, Parenti argues that the hearing officer's finding that he failed to communicate with the Hyneses on Saturday, July 14, 2001, despite Thomas Hynes' self-imposed deadline, is not supported by substantial evidence or is based on an error of law. Parenti argues that while he was meeting with the second prospective buyers, Thomas Hynes called hourly and spoke to Gallagher. He asserts that if the hearing officer's finding was based on the fact that Hynes talked to Gallagher rather than him, then the finding is based on an error of law because it implicitly deems a broker's duty to communicate with his client a non-delegable one.
The record reveals that Parenti relied heavily on detailed notes during his testimony to the point that the Hyneses' attorney objected that he was merely reading them into the record rather than testifying. (Tr. vol. II. at 143.) According to his testimony, Thomas Hynes called Parenti's office at 4:00 p.m. on Saturday, July 14, 2001 and was told by Gallagher that Parenti was meeting with the second prospective buyers. (Id. at 142.) He testified that Hynes, speaking to Gallagher, said that he would wait for Parenti to finish. (Id.) Parenti said that then Gallagher joined him in the conference room for the meeting. (Id. at 149.) He further testified that thereafter, Thomas Hynes called at 5:00 p.m., 6:00 p.m., and 7:00 p.m. and that he and the second prospective buyers could hear Hynes leaving messages on the office answering machine. (Id. at 150; Tr. vol. III at 17.) "I just ignored it," Parenti stated. (Id.) When he did finally speak to Hynes, it was 7:15 p.m.; at that point, Parenti told Hynes that after the first hour of the meeting, the wife "froze" and he "didn't think she was going to sign." (Tr. Vol. II at 154.)
The evidence just described is sufficient to support the hearing officer's finding that Parenti failed to communicate with the Hyneses on Saturday, July 14, 2001. The hearing officer did not premise this finding on the fact that Parenti's duties were non-delegable, but on the fact that a realtor's obligation is to communicate to his or her clients the pertinent, material, and important information that they need to make decisions. (Hr'g Off. Dec'n at 33.) As this finding is not clearly erroneous, it must be upheld.
Attacking the findings of the hearing officer collaterally, plaintiff Parenti asserts that none of those findings were supported by substantial evidence because Thomas Hynes' testimony as a whole was not credible. Parenti asserts that, in the instant case, the customary deference accorded the fact finder is undeserved. Parenti claims that it "strains credulity past the breaking point" to accept Thomas Hynes' testimony that the first time he saw Addendum A was at the hearing and that because this statement is obviously untrue, the rest of Hynes' testimony is suspect.
Essentially, Parenti asks this Court to find that the entire decision of the hearing officer was clearly erroneous based upon one arguable interpretation of one witness's testimony. A fact finder, however, is allowed to accept all of what a witness says, some of which a witness says or none of what a witness says. The finder of fact is in the best position to make such credibility judgments and his or her findings are binding on this Court if supported by competent evidence, as they are here. Poisson v.Comtec Info. Sys., 713 A.2d 230, 233 (R.I. 1998).
In reviewing an agency decision under R.I. Gen Laws § 42-35-15, this Court is not to examine whether the evidence is weak or strong, or even incredible; instead, the test is whether the findings of fact are supported by competent evidence.Edge-January, 430 A.2d at 1065; Restivo v. Lynch,707 A.2d 663, 665-666 (R.I. 1998) (citing Lett v. Caromile,510 A.2d 958, 960 (R.I. 1986)). After a thorough review of the entire record, it is abundantly clear that competent evidence exists to support each finding of fact made by the hearing officer. As such, those findings are not clearly erroneous and the Director was correct in accepting them in this case.
These findings, and the evidence supporting them, more than justify the hearing officer's decision. They support her conclusion that Parenti breached his fiduciary duties to the Hyneses and showed "bad faith, dishonesty, untrustworthiness or incompetency" in connection with the real estate transaction at issue, in violation of Rule 20 and R.I. Gen. Laws §§5-20.5-12(a)(15) and 5-20.5-12(a)(20).
 The Question of Due Process
Finally, plaintiff Parenti contends that the Director erred in imposing the punishment recommended by the hearing officer. He argues that he has a protected liberty interest in his good name and that publication of the fact of his license suspension inThe Providence Journal would violate his right to due process of law with respect to that interest. Parenti claims that the balancing test set forth in Matthews v. Eldridge, 424 U.S. 319
(1976), should be applied to determine whether he received the process he was due. He argues that the first two factors of the test, the private interest of the individual affected and the governmental interest in upholding the procedure, balance each other out. Plaintiff Parenti asserts, moreover, that the third factor, the risk of error created by the procedure employed, weighs heavily in his favor. Specifically, Parenti argues that the lack of both an articulated standard of care and burden of proof in the applicable laws or regulations or the hearing officer's decision creates a risk of error. In addition, he claims that because the hearing officer is an attorney rather than a realtor, she is not qualified to judge whether a realtor's conduct conforms to the relevant professional standards.
The United States Supreme Court has held that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." Paul v. Davis,424 U.S. 693, 708 (U.S., 1976) (citing Wisconsin v. Constantineau,400 U.S. 433 (1971)). The Rhode Island Supreme Court has held that "the fundamental [procedural] protection afforded by the due process clause of the Fourteenth Amendment is the opportunity for an individual aggrieved by certain governmental conduct to be heard at a meaningful time and in a meaningful manner." Kavenyv. Town of Cumberland Zoning Bd. of Rev., 875 A.2d 1, 10 (R.I. 2005) (quoting Trembley v. City of Central Falls,480 A.2d 1359, 1365 (R.I. 1984)). Plaintiff Parenti cannot dispute that he had both notice of and an opportunity to be heard with respect to the complaints lodged against him. (Id.)
Furthermore, it is well settled that in formal or informal adjudications modeled on the federal Administrative Procedures Act, the initial burdens of production and persuasion rest with the moving party — in this case, complainant Hynes. 2 Richard J. Pierce, Administrative Law Treatise § 10.7 at 759 (2002). Additionally, unless otherwise specified, a preponderance of the evidence is generally the burden of proof that a proponent must satisfy to prevail. (Id. at 763-766); see also Lyons v.Rhode Island Pub. Employees Council 94, 559 A.2d 130, 134 (R.I. 1989) (preponderance standard is the "normal" standard in civil cases.) The hearing officer here compared Parenti's conduct to the standards of conduct set forth in the Commercial Licensing Regulations and as articulated in the hearing officer's decision of "protect[ing] and promot[ing], as he/she would his own, the interests of the principal he/she has undertaken to represent," and the duty of "absolute fidelity." She found that the weight of the evidence supported a finding that Parenti's conduct did not meet those standards. The hearing officer was qualified, without any need for expert testimony or further definition of the standard of care, to make that determination. As such, Parenti's argument that there was an absence of an established standard of care, an articulated burden of proof or evidence establishing that the complainant proved a violation of the standards of conduct set forth in the rules and the law must be rejected.
Moreover, plaintiff Parenti has absolutely no basis for asserting that the hearing officer, an attorney with substantial expertise in matters within the agency's jurisdiction, was not qualified to judge whether Parenti conformed to this standard.See DePasquale v. Harrington, 599 A.2d 314, 316 (R.I. 1991) (noting that an agency's hearing officer has expertise in the relevant field). This argument, if followed to its illogical extreme, would mean that judges would be disqualified from adjudicating those cases in which they had no professional expertise. The hearing officer rendered a comprehensive decision that reflected an understanding of real estate purchase and sale transactions generally and the obligations of brokers in particular. Her decision followed a duly noticed, three-day public hearing at which plaintiff Parenti was permitted to testify and present witnesses and other evidence. It reflected a careful consideration of the record and detailed findings of fact and conclusions of law. Parenti was allowed to appeal that decision as a matter of right. The record demonstrates, therefore, that the decision of the hearing officer, as approved by the Director, did not violate the due process rights of the plaintiff.
 CONCLUSION
After a thorough review of the entire record, this Court concludes that the factual findings of the hearing officer, as accepted by the Director, are amply supported by the reliable, probative, and substantial evidence of record and hence are not clearly erroneous. The decision below does not violate the due process rights of the plaintiff nor does it prejudice his substantial rights. The decision of the hearing officer, as adopted by the Director of the Department of Business Regulation, was an appropriate decision based on the record evidence and the law. Accordingly, the decision below is affirmed. This Court further orders that the stay of that decision previously issued by the Court be lifted and that the time periods connected to the penalties imposed in the hearing officer's decision run from the date judgment is entered by this Court.
Counsel shall confer and submit to this Court forthwith for entry an agreed upon form of order and judgment that is consistent with this Decision.
[1] While both decisions of the hearing officer, as affirmed by the Director, are the subject of this appeal, this Court will refer to the decision of the hearing officer in the singular (meaning both her decision on the merits and her subsequent decision denying Parenti's motion for reconsideration), as approved by the Director.
[2] Those hearing transcripts, while voluminous, are comprised largely of irrelevant lines of questioning by Parenti's counsel, non-responsive answers to questions by Parenti that were often in the form of long narrative responses, unwarranted objections by his counsel and the related arguments of counsel, and colloquy with the hearing officer, who tried valiantly to bring order and focus to the proceeding.
[3] McEleny in fact testified that she previously had an agency agreement with her clients, but that it had expired. (McEleny Dep. at 23.) In any event, she and her clients had agreed that they would ask the seller to pay the commission or fee so that they did not have to pay it. (Id.) Hynes testified that Parenti never clarified for them whether McEleny had a buyer's agreement regarding her commission.
[4] Parenti's extensive and improper use of his notes during his testimony, done with the consent of his counsel and subject only to a belated objection by counsel for the Hyneses, undercut his testimony in its entirety.